Filed 12/15/14  P. v. Wardzala CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039227 |
| | (Santa Clara County |
| Plaintiff and Respondent, | Super. Ct. No. C1104912) |
| v. | |
| JOHN LAWRENCE WARDZALA, | |
| Defendant and Appellant. | |

Defendant John Lawrence Wardzala was convicted after a court trial of first degree burglary (Pen. Code, §§ 459-460, subd. (a)),[1] and selling stolen property (§ 496, subd. (a)).  The court also found true the special allegations that he had suffered three prior serious or violent felony convictions, i.e., strikes (§§ 667, subd. (b), 1170.12, subd. (c)(1)); had been convicted of two prior serious felonies (§§ 667, subd. (a)); and had been convicted of a felony resulting in his having served a prison term, and had not remained free of prison custody (or the imposition of a term of jail custody) for a period of five years (§ 667.5, subd. (b); prison prior).  Defendant thereafter brought a motion requesting that the court exercise its discretion to dismiss the prior strike allegations in accordance with *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*),

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

which was opposed by the People.  The court denied the *Romero* motion and sentenced defendant to a prison term of 35 years to life.

Defendant argues on appeal that the denial of his *Romero* motion constituted an abuse of discretion because the court failed to give adequate consideration to the remoteness of the strike offenses and his longstanding issues with mental illness.  He also argues that his sentence of 35 years to life constitutes cruel and unusual punishment.  We find no merit to either argument and will affirm the judgment.

FACTS

I.      *The April 2011 Burglaries*

Hilda and Jerry Ajlouny lived on Carol Drive in an unincorporated part of San José.[2]  The Ajlounys were elderly and disabled.  Hilda had recently suffered a heart attack.  The house in which the Ajlounys lived was approximately 6,000 square feet.  They lived on the two top levels.  Due to its ease of access, their main entrance was at the back of the house through a locking sliding glass door with a screen; the entrance led out to a deck that is adjacent to a driveway.  Their son, Jeffrey, and his wife and two children lived in another level of the house with a separate entrance.  There was a third, lower area of the house that Jeffrey was in the process of remodeling to turn into a rental unit.

On the evening of April 4, 2011, the Ajlounys' daughter, Mary Susan Germer-Euscher, stayed overnight to take care of her parents, which she often did.  The Ajlounys typically slept in the downstairs family room in the rear part of the house.  Hilda slept in a recliner chair because of her breathing difficulties, and Jerry slept on a nearby couch.  That evening, Mary Susan slept on a couch in the same room as her parents.  There was a kitchen with a dining area near the family room.  The Ajlounys' entrance to the home through the sliding glass door was by that dining area.  Hilda, a diabetic, typically left her

---

[2] We refer to witnesses by their forenames for the sake of convenience and clarity, and we mean no disrespect in doing so.

2

insulin testing meters in a black pouch on the kitchen table. She generally left her purse on the same kitchen table or in a nearby window seat. Before Mary Susan went to bed that night, she checked to make sure the front door and the sliding glass doors were locked. Jeffrey also checked the door at approximately 10:30 p.m., and it was secure. Hilda also testified that the door was closed and locked when they went to sleep.

When Mary Susan awakened at 5:30 the next morning, she noticed the sliding glass door was open, but the screen was closed. At the time, she had thought her father had left the sliding glass door open after getting up in the middle of the night to let in some fresh air or to smoke outside. After Mary Susan left for work, her sister (Maryann Salameh) arrived at the house to take care of her parents. In the course of performing her routine of testing her mother in the morning, Maryann noticed that the insulin testing meter was missing. Later in the evening, Maryann noticed that Hilda's purse was missing. When she was unable to find the purse, she concluded that it had been stolen and called 911.

Hilda's purse contained her husband's passport and driver's license, her checkbook, banking card, credit cards, driver's license, medical card, automobile club card, rewards cards, medication, a pair of Chanel sunglasses, and hearing aids. The hearing aids had cost $7,000. The family was never able to locate Hilda's insulin meter, hearing aids, or purse.

Several days later, Jeffrey noticed when he went downstairs to work on the unit he was renovating that most of his tools were missing. He provided a list of the missing items to the police. The missing property had a replacement value of over $3,200 and included cordless drills, cordless saws, various tools, and chargers.

II.     *Undercover Investigation and Arrest of Defendant*

In the fall of 2010, the San José Police Department obtained information that a person named John was performing "hot prowls," which are "burglar[ies] of occupied residential property committed at night while the occupants are asleep." (*People v.*

3

*Taylor* (1975) 46 Cal.App.3d 513, 519, fn. 3, disapproved on other grounds in *People v. Rollo* (1977) 20 Cal.3d 109, 120, fn. 4.) Officer Stephen Rafala, who was part of the narcotics covert investigations unit of the South Bay Metro Task Force, was assigned to act as an undercover officer to investigate these crimes. Throughout his investigation, Officer Rafala had both telephonic and face-to-face contact with defendant, and he (Officer Rafala) bought stolen property from him. They met for the first time in October 2010. When they met, defendant identified himself as a burglar, and Officer Rafala identified himself as a fence (seller of stolen property). Between November 2010 and defendant's arrest on April 8, 2011, defendant contacted Officer Rafala as often as 10 times a day, and the undercover officer contacted defendant as often as three times a day. They met face-to-face on three occasions and also exchanged text messages. Some of their telephone conversations and two of their face-to-face conversations were secretly recorded by Officer Rafala; the recordings were introduced into evidence at trial.

Defendant spoke on the telephone with Officer Rafala on November 2 and 10, 2010. In both conversations, defendant indicated he had immediate plans of breaking into a tool truck to steal tools and to sell them to the undercover officer.

On December 2, 2010, defendant and Officer Rafala spoke on the telephone. Defendant said he had a woman's social security card, a photo identification, a Sears credit card, an EBT card, and documents relating to the foreclosure of her home. He offered to sell the documents to the undercover officer for $300. Based upon his conversations with defendant, Officer Rafala believed defendant had stolen the items from the woman because he had been upset that she had taken his lighter. Defendant also said that if he could make a down payment on a truck, he would start " 'ripping and roaring,' " which, based upon Officer Rafala's dealings with defendant, meant that he would "actively use the vehicle [for] more burglaries." They met later that day in a Safeway parking lot, where defendant sold the stolen cards and documents to Officer

4

Rafala for $140. Officer Rafala did not arrest defendant at the time because he wanted "to build a bigger case" against defendant and because the victim could not be located.

On December 7, 2010, defendant spoke with Officer Rafala on the telephone. Defendant told the undercover officer that he had stolen 16 sets of rims. On December 14, 2010, Officer Rafala telephoned defendant. Defendant said he planned to steal a truckload of tools that night. Defendant was arrested shortly after his December 14, 2010 contact with Officer Rafala. They next had contact in April 2011.

In a telephone conversation on the morning of April 8, 2011, defendant told Officer Rafala he had stolen a purse from a house. Officer Rafala testified that defendant "[had gone] through a sliding glass door or sliding door in the back. And he was trying to sell [Officer Rafala] the stolen property and he was naming everything that he had from the residential burglary he committed a few days prior." Defendant told him that " 'the stupid bitch deserve[d] it for leaving the door open.' " He indicated that the purse of a woman named Ajlouny contained her checkbook, her two driver's licenses, her husband's driver's license and passport, and an "inch-thick set of credit cards" (including Macy's, American Express, Discover, Target Visa, Old Navy, T.J. Maxx, Marshall's, Lane Bryant, and Old Navy). Defendant said the last activity in the bank account was a $600 deposit on March 8, but the account holder had made a $20,000 deposit to open the account. Defendant also told Officer Rafala the cards, passport and checkbook were "less than 72 hours" old.

In the same April 8 telephone conversation, defendant told Officer Rafala that he had stolen various tools (e.g., drill bits, chisels, electric saws, electric nail guns, and four Dewalt rechargeable batteries). He said he had personally carried them for 10 miles. Defendant offered the tools for sale for $500. They agreed to meet later in the day near a lightrail station near Highway 87.

At about 6:30 p.m. on April 8, 2011, Officer Rafala met with defendant at a parking lot in the prearranged location. Defendant brought the tools, checkbook, credit

5

cards and other papers mentioned in his earlier conversation. He told Officer Rafala that he stood watch while an accomplice entered the residence with a man sleeping on the couch. Defendant said "this motherfucker walk[ed] calmly . . . about five feet from the motherfucker and pick[ed] up the fuckin' purse and walk[ed] right the fuck back out." Defendant bragged to the undercover officer that burglarizing an occupied home was "one of the ultimate rushes." Defendant told Officer Rafala that he had stolen the tools from the same location as the purse, but on a different day. Officer Rafala bought the credit cards, identification cards, and checkbook from defendant for approximately $2,000. He also bought the nailguns for $250. As Officer Rafala was counting out the money for defendant, other police officers arrived and placed defendant under arrest.

THE PRIOR STRIKES[3]

Defendant was convicted previously of three violent or serious felonies.

### I.     *The First Strike Prior*

On May 1, 1996, defendant pleaded guilty to first degree burglary (§§ 459/460, subd. (a)), a strike (§ 1170.12, subd. (c)(1)). He also pleaded guilty to vehicle theft (Veh. Code, § 10851, subd. (a)). He was granted three years' probation by the court on May 20, 1996, with the condition that he serve one year in jail.

The charged crimes arose out of the late-night burglary of a mobilehome located in Mountain View that was committed on December 12, 1995, while its residents were asleep. Defendant was 18 years old at the time of the offense. One of the victims had awakened at 3:30 a.m. to a strange noise, but had not investigated it at the time because he attributed it to stormy weather. Three hours later, he discovered the mobilehome had been burglarized. A screen to the laundry room window had been cut and two doors were unlocked, indicating the probability that the initial entry had been through the window and the doors were then unlocked for access by other individuals. The victims

---

[3] Our summaries of the strike priors are taken from the probation reports.

determined that three pagers, a modem, a work identification card, car keys, and their 1990 Daihatsu automobile were missing. After his apprehension, defendant admitted his involvement in the commission of the crimes with three or four other individuals.

*II.     The Second and Third Strike Priors*

On December 31, 1996, defendant pleaded guilty to two counts of first degree burglary (§§ 459/460, subd. (a)), which counted as two strikes (§1170.12, subd. (c)(1)). He also pleaded guilty to vehicle theft (Veh. Code, § 10851, subd. (a)); evading a peace officer (§ 2800.1); and hit and run driving (Veh. Code, § 20002, subd. (a)). The court sentenced defendant to a term of 13 years in prison.

The charged crimes arose out of events occurring in a Mountain View mobilehome park on August 20, 1996—exactly two months after he had been granted probation as a result of the prior strike conviction, and one day after he had been released from custody. At approximately 1:45 a.m., officers responded to a reported burglary and met with the owner of the unit in space five of the park. She had been awakened by a barking dog. She and her companion had discovered that a screen had been removed from a window and a stereo was missing. The speakers were found on the patio floor. It was determined that the point of entry had been through a window after its screen had been cut. As the officers investigated the area, they saw two "suspicious suspects . . . inside a [Lexus] vehicle at space number 214." The car fled, the officers gave chase, and the Lexus crashed into a pole outside of a movie theater. Defendant and his accomplice attempted to flee but were apprehended. Defendant told police he had been staying at a juvenile's home. They had decided to burglarize homes and steal a pickup truck, and defendant had "wanted to show the juvenile how to do things quietly." Defendant, who carried a BB gun "in case they needed to scare someone off," used a razor to cut the window screen to gain access to one of the mobilehomes.

During a subsequent investigation, officers discovered that the mobilehome at space number 214 was also entered while the occupants were asleep. The victims

7

reported that their Lexus was missing and that a pager had been taken from the nightstand next to the bed where they had been sleeping.

PROCEDURAL BACKGROUND

Defendant was charged by a first amended information filed on August 4, 2012, with two felonies, namely, first degree burglary (§§ 459-460, subd. (a)) occurring on or about April 5, 2011; and selling stolen property (§ 496, subd. (a)) occurring on or about April 8, 2011. It was alleged that defendant had suffered three prior strikes (§§ 667, subd. (b), 1170.12, subd. (c)(1)); had been convicted of two prior serious felonies (§§ 667, subd. (a)); and had one prison prior (§ 667.5, subd. (b)).

A court trial commenced on August 6, 2012. On August 8, 2012, the court found defendant guilty of both charged felonies. It also found true all special allegations.

Defendant thereafter filed a motion to have the court exercise its discretion to strike the three prior strike allegations, in accordance with *Romero*, *supra*, 13 Cal.4th 497. The People opposed defendant's *Romero* motion. After hearing argument on January 18, 2013, the court denied defendant's motion. The court then granted the People's motion to amend the first amended information to allege that the crimes described in count 1 and count 2 occurred between April 5 and April 8, 2011. The court imposed a sentence of 25 years to life for the count 1 conviction pursuant to the Three Strikes law, and a concurrent prison term of 25 years to life for the count 2 conviction. The sentence on the count 2 conviction, however, was stayed pursuant to section 654. The court also imposed two separate and consecutive five-year prison terms for the two serious felony priors (§ 667, subd. (a)) for a total prison term of 35 years to life.

8

## DISCUSSION

### I. *Denial of* Romero *Motion*

#### A. Applicable Law

The California Supreme Court held in *Romero* that the trial court, on its own motion, is empowered under section 1385, subdivision (a) to dismiss or strike prior felony conviction allegations in cases that are brought under the law known as the "Three Strikes" law. (*Romero*, *supra*, 13 Cal.4th at pp. 529-530.) The court's discretion, however, is limited to instances in which dismissing such strikes is in the furtherance of justice, as determined by giving " ' "consideration both of the constitutional rights of the defendant, and *the interests of society represented by the People . . . .*" ' " (*Id.* at p. 530, original italics.) Thus, the court may not strike a sentencing allegation "solely 'to accommodate judicial convenience or because of court congestion[' citation, or] simply because a defendant pleads guilty. [Citation.] Nor would a court act properly if 'guided solely by a personal antipathy for the effect that the three strikes law would have on [a] defendant,' while ignoring 'defendant's background,' 'the nature of his [or her] present offenses,' and other 'individualized considerations.' [Citation.]" (*Id.* at p. 531.)

The Supreme Court later explained "the 'concept' of 'furtherance of justice' within the meaning of Penal Code section 1385[, subdivision] (a) [which *Romero* had recognized as being] ' "amorphous." ' [Citation.]" (*People v. Williams* (1998) 17 Cal.4th 148, 159 (*Williams*).) It noted that in deciding whether to dismiss a strike " 'in furtherance of justice' pursuant to Penal Code section 1385[, subdivision] (a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his [or her] present felonies and prior serious and/or violent felony convictions, and the particulars of his [or her] background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he [or she] had not previously been convicted of one or more serious and/or violent felonies." (*Id.* at p. 161.) The sentence to be meted

9

out to the defendant "is also a relevant consideration . . . in fact, it is the overarching consideration because the underlying purpose of striking prior conviction allegations is the avoidance of unjust sentences. [Citation.]" (*People v. Garcia* (1999) 20 Cal.4th 490, 500.) If the court strikes or dismisses one or more prior conviction allegations, its reasons for doing so must be stated in an order entered on the minutes. (*Ibid.*) Conversely, the trial court has no obligation to set forth its reasons for deciding *not to* strike or dismiss prior strikes. (*In re Large* (2007) 41 Cal.4th 538, 546, fn. 6; see also *In re Coley* (2012) 55 Cal.4th 524, 560.)

The granting of a *Romero* motion is "subject to review for abuse of discretion. This standard is deferential. [Citations.] But it is not empty. Although variously phrased in various decisions [citation], it asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts. [Citations.]" (*Williams*, *supra*, 17 Cal.4th at p. 162; see also *People v. Garcia*, *supra*, 20 Cal.4th at p. 503.) This abuse of discretion standard also applies to appellate review of the denial of *Romero* motions. (*People v. Carmony* (2004) 33 Cal.4th 367, 374-376 (*Carmony*); see also *id.* at p. 375: " 'Discretion is the power to make the decision, one way or the other.' ") It is the defendant's burden as the party attacking the sentencing decision to show that it was arbitrary or irrational, and, absent such showing, there is a presumption that the court " ' "acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.]" (*Id.* at p. 377.) Such a discretionary decision " ' "will not be reversed merely because reasonable people might disagree." ' " (*Ibid.*)

Placing in context the circumstances under which a court properly exercises its discretion in granting a *Romero* motion, the Supreme Court has explained: "[T]he [T]hree [S]trikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence

10

that conforms to these sentencing norms is both rational and proper. [¶] In light of this presumption, a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances." (*Carmony*, *supra*, 33 Cal.4th at p. 378.) "Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he [or she] squarely falls once he [or she] commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Ibid.*)

### B.    Defendant's *Romero* Motion

Defendant argued below that the court should dismiss the prior strike allegation because he was "not the hardened recidivist contemplated by the Three Strikes law, but a man who ha[d] struggled with severe mental illness all of his adult life, and who's [*sic*] criminality is a direct and proximate result of his unsuccessful attempts to deal with his illness." He argued that he had "been diagnosed with [bipolar] disorder, depression, mood disorder, bulimia, and borderline personality disorder." He sustained a head injury when he was 13 years old, and had engaged in cleanliness rituals, cutting, and self-induced vomiting. He had reported suicidal ideation on several occasions. Because his criminality was tied to his longtime mental illness, he argued, his culpability for his current and prior offenses was mitigated, and the court should exercise its discretion by striking the prior strike allegations.

The People responded in their written opposition that defendant "fit[] squarely within the spirit of the Three Strikes [l]aw" and that the court should deny the *Romero* motion and impose the maximum sentence of 50 years to life, consecutive to 11 years. The People emphasized defendant's criminal history and his poor performance on parole and probation. They noted that defendant had been convicted in 1996 of first degree burglary and vehicle theft and had "targeted victims in their mobilehomes while they

11

were sleeping." Defendant "failed to learn a lesson and committed another residential burglary and vehicle theft later that same year, for which he was sentenced to 13 years in prison." He sustained another conviction for forgery in 2009 very shortly after his release from prison, and was incarcerated again in 2010 for a drug offense. The People urged that the court give weight to the nature of defendant's current offense and his history of committing " 'hot prowl' burglaries" in reaching the conclusion that he should receive the maximum sentence under the Three Strikes law.

At the hearing on the *Romero* motion, defense counsel reiterated that defendant had an extensive mental health history over the entire period he was in prison. Defense counsel indicated that the records showed that defendant had twice attempted suicide and had also received various medications.

The court noted that it had considered the nature and circumstances of the current crime, in particular that, while it was not violent, it was very traumatic to the occupants of the residence. In addition, Hilda Ajlouny had lost some expensive items as a result of the burglary, including her diabetes testing meter and her glasses. The court also considered the prior strike offenses, noting that they were significant crimes in which residential burglaries occurred while people were at home, thereby placing them and defendant "in great jeopardy." The court also observed that while the strike priors were remote in time, defendant had been in custody for the vast majority of time between their commission and his commission of the current crime. The court indicated that it had also considered defendant's mental health history, his performance on probation and parole, his family and background, his employment, and his future prospects. Based upon its consideration of all factors, the court denied defendant's *Romero* motion.

C.     Discussion Regarding Denial of *Romero* Motion

Defendant argues that because both of his strike priors are remote in time, and because he has a history of mental illness, these mitigating factors warranted the granting

12

of his *Romero* motion. As a result, he argues, the court abused its discretion by failing to dismiss at least one of the three prior strikes.

As noted, the court must determine from a review of the relevant factors whether there are " 'extraordinary' " circumstances such that the defendant, a " 'career criminal[,] can be deemed to fall outside the spirit of' " the Three Strikes law. (*Carmony*, *supra*, 33 Cal.4th at p. 378.) The court, in considering the *Romero* motion, was obliged to consider the three factors identified by the California Supreme Court in *Williams*, namely, "[1] the nature and circumstances of [defendant's] present felonies[, 2] the nature and circumstances of defendant's] prior serious and/or violent felony convictions, and [3] the particulars of [defendant's] background, character, and prospects . . . ." (*Williams*, *supra*, 17 Cal.4th at p. 161.) Our review of the record shows that the court considered each of these factors in concluding that this case did not present extraordinary circumstances warranting the court's dismissal of the prior strike offenses.

Concerning the first factor (current offenses), the fact that no one was physically hurt is not a basis for the granting of a *Romero* motion. (See *People v. Strong* (2001) 87 Cal.App.4th 328, 344 [reversing order granting *Romero* motion which was based in part on nonviolent nature of current offense; "the nonviolent or nonthreatening nature of the felony cannot alone take the crime outside the spirit of the law"]; *People v. Gaston* (1999) 74 Cal.App.4th 310, 321 (*Gaston*) [although current crime of car theft "not as serious as many felonies," it was "far from trivial"].) There was certainly emotional injury to the occupants in having their home violated in the middle of the night while they were sleeping. As the trial court noted in this case: "[S]ometimes emotional injuries leave greater scars than physical ones." And as previously noted, some expensive things, including Hilda's hearing aids, were taken and, as of trial, had not been replaced. Furthermore, it is significant that one of the current crimes—first degree burglary—was itself a serious or violent felony (strike). As the court noted, this late-night home burglary while occupants were sleeping placed both the residents and defendant at great

13

risk. (See *People v. Cruz* (1996) 13 Cal.4th 764, 775 [heightened statutory protection given to burglaries of occupied dwellings "in order to avoid the increased danger of personal violence attendant upon an entry into a 'building currently used as sleeping and living quarters' "]; see also in *People v. Gauze* (1975) 15 Cal.3d 709, 715 (*Gauze*).)

Addressing the second factor in *Williams*, each of the three prior strike offenses was, like one of the current crimes, a first degree burglary exposing the sleeping occupants to potential serious harm. (*Gauze*, *supra*, 15 Cal.3d at p. 715.) It is true that the prior strikes involved crimes that were remote in time—occurring around 15 years before the commission of the current offenses. But the record shows that defendant was not given the opportunity to reoffend because he had been incarcerated for the vast majority of that time. After sentencing on the second and third strike convictions, defendant was in prison from 1996 to December 2008, when he was released on parole. He was returned to prison and again paroled in January 2009. His criminality continued after his release in 2009 until he was arrested in April 2011 for the current offenses. He was convicted in June 2009 of forgery (§ 470, subd. (d)), and received probation conditioned on serving nine months in county jail. He was also charged with petty theft (§§ 485/488) and was convicted in December 2009 of an infraction (§ 490.1). And in August 2010, he was convicted of possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)), and received three years' probation on condition he serve 360 days in county jail. Under these circumstances, the fact that the prior strike offenses were somewhat remote in time provides little or no support for defendant's position. (See *People v. Pearson* (2008) 165 Cal.App.4th 740, 749 [rejecting argument that prior strikes should have been dismissed because they were remote, because of violent nature of current crime, and because defendant had led a continuous life of crime and had performed poorly on probation and parole]; *Gaston*, *supra*, 74 Cal.App.4th at p. 321 [remoteness of prior strikes "not significant" in view of the defendant's lengthy criminal history].)

14

The third *Williams* factor—"the particulars of [defendant's] background, character, and prospects" (*Williams*, *supra*, 17 Cal.4th at p. 161)—does not favor dismissal of the prior strikes. As noted, defendant's criminal history was extensive and he demonstrated no ability after his 2009 release from prison to lead a life without committing crimes. Prior to the two current felony offenses, defendant had been convicted of six felonies (including the three prior strikes) and three misdemeanors. Additionally the crimes of which defendant was convicted after his release from prison in 2009—including the current crimes—were committed while defendant was on parole. According to defendant's parole officer, defendant had "accumulated six parole violations since 2008." And there was evidence—challenged by defendant—that he violated probation on multiple occasions. Defendant's recidivism and multiple parole and probation violations demonstrate that he had not learned from his mistakes. (See *Williams*, *supra*, 17 Cal.4th at p. 163 [noting that multiple convictions prior to the present offense indicated that the defendant " 'had been taught, through the application of formal sanction, that [such] criminal conduct was unacceptable—but had failed or refused to learn his lesson' "].) As succinctly stated by the probation officer: "Of serious concern . . . is the fact the defendant continues to commit similar acts of misconduct against not just the property of others, but violat[es] their personal homes and sanctuaries."

In addition to defendant's criminal history, it is clear that the court considered other aspects of defendant's background, including his family background, employment, and his mental health history. Defendant at sentencing was a 35-year-old single man with no children or family in California. Based upon the record before us, defendant had a minimal history of employment. As noted by the probation officer: "Defendant lacks a notable employment history, and has spent much of his adult life in custody." Although he admitted the current offense of possession of stolen property, he denied responsibility for the burglary, and he blamed his relapse into criminal behavior upon lack of assistance from parole authorities upon his release from prison. He told the probation officer that

15

"[h]e 'pan handles' to earn money for . . . marijuana, which he uses three to four times a day." And he stated that he "[could] not live on the streets in California without being dishonest, and [was] unable to move to Illinois or Alabama to live with family because he [was] stuck in the system." The probation officer found no circumstances in mitigation, and several in aggravation, including the vulnerability of the victims and his prior unsatisfactory performance on probation and parole. The officer indicated: "[Defendant's] blatant and continuous disregard of others is disturbing and shows the defendant has not taken the orders of the Courts seriously."

Defendant emphasizes his "history of mental illness" as a mitigating factor that supported the dismissal of at least one of the prior strikes. It is clear that the court, in evaluating various aspects of defendant's background, considered his mental health history. The court acknowledged it had reviewed defendant's mental health circumstances as outlined in the brief submitted by his counsel, and it had also observed defendant's behavior in court. The court noted that defendant had no remorse for his criminal behavior. And defendant's callous remarks—secretly recorded by Officer Rafala—that (1) " 'the stupid bitch deserve[d] [to be burglarized] for leaving the door open' "; and (2) burglarizing a home with sleeping occupants was "one of the ultimate rushes," also support the denial of defendant's *Romero* motion.

Defendant does not cite any authority—nor are we aware of any—that suggests that a court, as a general rule, should exercise its discretion to dismiss a strike when a defendant presents a history of mental illness. To the contrary, a similar argument was rejected in *People v. Carrasco* (2008) 163 Cal.App.4th 978 (*Carrasco*). There, the defendant asserted unsuccessfully that the trial court should have dismissed a prior strike allegation because, in addition to long-term drug use, he had " 'some significant mental health history and issues that [had], for the most part, been undiagnosed and untreated.' " (*Id.* at p. 992.) The trial court commented that case law did not authorize consideration of the defendant's " 'mental state, his mental condition, the reasons why he wanted to do

16

these things.' " (*Id.* at p. 993.)  The appellate court rejected the defendant's claim that the trial court had erred in this respect.  (*Ibid.*)  It explained, "The record reflects the trial court considered a wide range of appropriate factors in passing sentence, particularly the nature and circumstances of appellant's present and past convictions."  (*Ibid.*)  Since the trial court had expressly considered the defendant's "background and character in ruling on the motion," its remarks about his mental condition amounted to "an acknowledgement that the court could not give undue weight to an inherently speculative argument that defendant's mental state 'made him do it.' " (*Id.* at pp. 993-994.)

Here, in emphasizing the mental health issues that may have motivated or explained his criminality, defendant either ignores or minimizes other aspects of his "background, character, and prospects" (*Williams*, *supra*, 17 Cal.4th at p. 161) relevant to the court's disposition of the *Romero* motion.  As explained, those aspects were unfavorable to his position.

The court—after giving due consideration to the specifics of the current offense, the nature of the prior strike offenses, and defendant's background character and prospects (including his criminal record)—properly concluded that defendant did not fall outside of the letter and spirit of the Three Strikes sentencing scheme.  (See *People v. Philpot* (2004) 122 Cal.App.4th 893, 906-907 [court properly considered the defendant's history of continuously committing crimes for 20 years, his underlying drug addiction, and the prior and current offense as indicative of his poor future prospects and that, as "a flagrant recidivist," he was not outside the spirit of the Three Strikes law].)  The circumstances presented by defendant here are not so " 'extraordinary' " as to fall outside the spirit of the Three Strikes law.  (*Carmony*, *supra*, 33 Cal.4th at p. 378.)  Because the court's ruling did not " 'fall[] outside the bounds of reason' under the applicable law and the relevant facts [citation]" (*Williams*, *supra*, 17 Cal.4th at p. 162), we find that the court did not abuse its discretion in denying defendant's *Romero* motion.

17

## II.     *Cruel and Unusual Punishment*

### A.     Background and Forfeiture

Defendant contends that his sentence of 35 years to life in prison under the circumstances here "is grossly disproportionate to the crime." He therefore asserts that his sentence constitutes cruel and unusual punishment prohibited by the federal and state Constitutions.

The Attorney General responds that defendant's constitutional challenge to the sentence was not raised below and has therefore been forfeited, citing *People v. Norman* (2003) 109 Cal.App.4th 221, 229. Defendant does not deny that his counsel failed to raise the issue below. But he contends that this court has the discretion to consider the challenge, and he urges that we the do so because addressing it may avoid having to address a future contention that the failure to object constituted ineffective assistance of counsel. We will exercise our discretion to consider defendant's contention on the merits in the interest of judicial economy. (See *People v. Christensen* (2014) 229 Cal.App.4th 781.)

### B.     Discussion of Constitutional Claim

The Eighth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." (U.S. Const., 8th Amend.) Article 1, section 17, of the California Constitution likewise declares that "[c]ruel or unusual punishment may not be inflicted or excessive fines imposed." The state and federal prohibitions are not coextensive. (*People v. Anderson* (1972) 6 Cal.3d 628, 634.)

A punishment is cruel and unusual under the Eighth Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173; see also *Ewing v. California* (2003) 538 U.S. 11, 21; *Lockyer v. Andrade* (2003) 538 U.S. 63, 72.) Cruel

18

and unusual punishment under this state's constitution occurs when a penalty is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).) Thus, the federal constitution "affords no greater protection than the state Constitution." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.)

Because a sentence that is constitutional under the California criteria for cruel and unusual punishment is also constitutional under the Eighth Amendment, we evaluate defendant's claim that his sentence constitutes cruel and unusual punishment under California Supreme Court authority, which has identified three factors to be considered in this inquiry: (1) "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society" (*Lynch*, *supra*, 8 Cal.3d at p. 425); (2) a "compar[ison of] the challenged penalty with the punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious" (*id.* at p. 426, original italics); and (3) "a comparison of the challenged penalty with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision" (*id.* at p. 427, original italics). The defendant bears the burden of establishing that the punishment prescribed for his offense is unconstitutional. (*People v. King* (1993) 16 Cal.App.4th 567, 572.)

Defendant here bases his challenge solely on the first *Lynch* factor, which he characterizes as having four separate prongs: (1) the nature of the offense; (2) the nature of the defendant; (3) the danger of the offense; and (4) the danger of the offender. Because defendant makes no argument regarding the second and third *Lynch* factors, we need not address them here. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [legal argument for which there is no citation of authorities may be deemed forfeited on appeal]; *People v. Miralrio* (2008) 167 Cal.App.4th 448, 452, fn. 4 [appellate court not required to address undeveloped claims or ones inadequately briefed].) We will address the nature/danger of the offense, and then consider the nature/danger of the defendant.

19

In evaluating the nature of the offense, we look at "the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People v. Dillon* (1983) 34 Cal.3d 441, 479 (*Dillon*), abrogated on other grounds by *People v. Chun* (2009) 45 Cal.4th 1172, 1185–1186.)  As far as motive is concerned, from what can be gleaned from the record, it appears that defendant was motivated by personal gain, along with the personal thrill of entering an occupied home at night to commit a theft while the residents slept.  Although defendant denied any personal involvement, the trial judge disagreed, concluding that he at minimum aided and abetted the burglary by standing by outside as a lookout while an accomplice committed the burglary.  As a consequence of his actions, the occupants who were sleeping in the home at the time were traumatized.  Jeffrey Aljouny, who lived with his family in another level of the burglarized house, told the probation officer—a year and one-half after the burglary—that his family had "had '[n]o peace of mind' since the incident . . . . He stated they cannot walk around the house without looking over their shoulders now, and every noise has him getting up to look for intruders."  And Maryann Salameh, Jeffrey's sister, similarly told the probation officer 18 months after the burglary that she felt very unsafe being in the home in which she had been born and raised.

Defendant minimizes the severity of the current crime, arguing that no one was injured or threatened as a result of the burglary and, in fact, "the crime victims never awakened."  This argument fails to consider the emotional trauma suffered by the victims as noted above.  Furthermore, defendant's position ignores the serious threat of harm inherent in the nighttime burglary of an occupied dwelling.  (See *Gauze*, *supra*, 15 Cal.3d at p. 715.)

"Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that

20

the occupants will in anger or panic react violently to the invasion, thereby inviting more violence." (*People v. Lewis* (1969) 274 Cal.App.2d 912, 920 (*Lewis*).) This passage from *Lewis* has been cited with approval on two occasions by the California Supreme Court. (See *People v. Montoya* (1994) 7 Cal.4th 1027, 1042; *Gauze*, *supra*, 15 Cal.3d at p. 715.) Other courts have also recognized the threat-of-harm aspect of such burglaries in rejecting contentions that the sentence imposed for first degree burglary convictions constituted cruel and unusual punishment. (See, e.g., *People v. Ingram* (1995) 40 Cal.App.4th 1397, 1414, disapproved on other grounds in *People v. Dotson* (1997) 16 Cal.4th 547, 560, fn. 8; *People v. Weaver* (1984) 161 Cal.App.3d 119, 127.) Moreover, the Legislature has recognized in the Three Strikes law the inherent danger and serious nature of first degree burglary, insofar as that crime is both a "violent felony" (§ 667.5, subd. (c)(21), and a "serious felony" (§ 1192.7, subd. (c)(18)). (See *People v. Mantanez* (2002) 98 Cal.App.4th 354, 366 [rejecting cruel and unusual punishment challenge to sentence under Three Strikes law where defendant's strikes included "forcible entries into homes where residents are present"].)

As to the nature of the particular offender, we focus on "individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Dillon*, *supra*, 34 Cal.3d at p. 479.) Defendant, at sentencing, was 35 years old. He had spent the vast majority of his adulthood in custody. One of his current crimes— first degree burglary—was the same crime he had committed on three prior occasions.

As noted above, defendant has consistently demonstrated an inability to lead a crime-free life. Indeed, defendant acknowledges that he "has [had] a significant criminal history," but suggests that his mental illness is behind his criminality. His performance on probation and parole has been poor. After his ultimate release from prison in January 2009 after serving his sentence on the second prior strike conviction, he was arrested in March 2009 and charged with forgery, of which he was convicted in June 2009. And between December 2008 and April 2011 (when he was arrested for the current offenses),

21

he was convicted of a misdemeanor (possession of a controlled substance) and an infraction (petty theft, reduced from a charged misdemeanor to an infraction). Additionally, defendant has no family roots in California and has only a limited employment history. And the trial court found that defendant showed no remorse for his crimes. He continues to deny responsibility for the current burglary offense, and in his conversations with Officer Rafala he bragged about the "rush" of committing hot prowls and showed a callousness toward his victims.

Defendant's reliance on his history of mental illness and the fact that his criminal history does not show a propensity toward violence is unavailing. Defendant cites no authority to support his position that his mental illness history and lack of violent criminal conduct, as isolated facts when looking at the totality of the circumstances, are sufficient to support a claim of cruel and unusual punishment. The fact remains that defendant has spent the vast majority of his adult life in prison or jail, has demonstrated an inability to curb his criminality, and has a propensity for committing one particular crime—first degree burglary—that is both a violent felony and a serious felony under the Three Strikes law.

Defendant has failed to meet his burden of establishing that his punishment was cruel and unusual. (*People v. King*, *supra*, 16 Cal.App.4th at p. 572.) We conclude that, under either the state or federal constitution, the trial court's decision to impose the term of 35 years to life was not "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.)

DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Grover, J.